IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| DEBRA A. DYE | ) | Case No. 1:19-cv-2670 |
| | ) | |
| Plaintiff, | ) | JUDGE SOLOMON OLIVER, JR. |
| | ) | |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| COMMISSIONER OF | ) | THOMAS M. PARKER |
| SOCIAL SECURITY, | ) | |
| | ) | **REPORT & RECOMMENDATION** |
| Defendant. | ) | |

**I.     Introduction**

Plaintiff, Debra A. Dye, seeks judicial review of the final decision of the Commissioner of Social Security denying her application for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act.  This matter is before me pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), and Local Rule 72.2(b).  Because the Administrative Law Judge ("ALJ") failed to properly apply the treating physician rule, I recommend that the Commissioner's final decision denying Dye's SSI application be VACATED and that her case be REMANDED for further consideration.

**II.     Procedural History**

Dye filed for SSI on May 27, 2016.  (Tr. 311).[1]  She alleged that she became disabled on March 1, 2007[2] due to carpal tunnel in both hands, Arnold-Chiari malformation[3], asthma, IBS,

---

[1] The administrative transcript is in ECF Doc. 9.
[2] Dye filed prior applications; the ALJ determined that the doctrine of res judicata applied for the period March 1, 2007 through December 26, 2013, but not thereafter.  (Tr. 13).
[3] Chiari malformation is a condition in which brain tissue extends into the spinal cord because an abnormally small or misshapen skull is pressing on the brain, forcing it downward.

essential hypertension, panic disorder with agoraphobia, bipolar affective disorder, migraines, chondromalacia of left patella, cubital tunnel syndrome. (Tr. 311, 342). The Social Security Administration denied Dye's application initially and on reconsideration. (Tr. 264, 273). Dye requested an administrative hearing. (Tr. 279). ALJ Traci Hixson heard Dye's case and denied the claim in a September 27, 2018, decision. (Tr. 12-28). On September 23, 2019, the Appeals Council denied further review, rendering the ALJ's decision the final decision of the Commissioner. (Tr. 1-3). On November 14, 2019, Dye filed a complaint challenging the Commissioner's decision. ECF Doc. 1.

### III. Evidence

#### A. Relevant Medical Evidence

On February 26, 2015, Dye was examined by Dr. Jose Mendoza who noted dysphoric mood and somatic symptoms, fatigue and abdominal pain. (Tr. 1621). She followed-up with Dr. Mendoza on March 25, 2015 after an emergency room visit for a panic attack on March 15th. Dr. Mendoza noted sleep disturbance and agitation. (Tr. 1617-1619). On April 17, 2015, Dye reported daily abdominal pain that had been waxing and waning. The pain was located in the generalized abdominal region. She also reported worsening leg pain, rating it as 7/10 in severity. (Tr. 1612).

Dye underwent a mental health assessment on March 20, 2015. She reported anxiety attacks, panic attacks and agoraphobia. Her conditions had worsened after her prescription for Valium was stopped. (Tr. 1828). Following her assessment, Dye was diagnosed with panic disorder with agoraphobia and a Global Assessment of Functioning ("GAF") of 53. The counseling goals set on March 20, 2015 were reducing anxiety and agoraphobia symptoms. (Tr. 1852). Dye continued counseling and treatment for anxiety and agoraphobia through October 2016. (Tr. 1849, 1868, 1871, 1841, 1840, 1837, 1836, 1823, 1822, 1762, 1751, 1754).

In July 2015, an upper GI endoscopy showed a normal esophagus and gastritis. (Tr. 1533). On August 17, 2015, Dye reported ongoing abdominal pain occurring every several days. She described the pain as mild, 2/10. She continued to have sleep disturbances and agitation. (Tr. 1595). On September 15, 2015, Dye reported recurring, aching, severe neck pain. (Tr. 1590). On November 10, 2015, Dye continued to have abdominal pain in her right upper quadrant and neck pain. She also reported new daily flank pain, and described it as 1/10 in severity. (Tr. 1581). Physical therapy notes from November 30, 2015 show that Dye had not been to therapy for three months because she had been diagnosed with "Chiari," which had caused dizziness and nausea. (Tr. 1042). Dye reported frequent early morning headaches to Dr. Sastry S. Panchagnula on December 10, 2015. (Tr. 649).

On January 16, 2016, Dye met with Dr. Mario M. Sertich. She complained of headaches, neck and upper and low back pain and dizziness. Dr. Sertich noted that a brain MRI had shown Arnold Chiari malformation. (Tr. 1022-1023). Dr. Sertich recommend that Dye get another opinion from the Cleveland Clinic as to treatments that might alleviate her headaches. (Tr. 1026).

On February 9, 2016, another upper GI endoscopy showed normal results. (Tr. 611). On February 11, 2016, Dye was examined by certified physician assistant, Susan Jakubek, at the Cleveland Clinic. Dye reported headaches, numbness and tingling in her arms and legs, memory loss, weakness in arms and legs, difficulty swallowing, ringing in her ears, vertigo associated with headaches, nausea and vomiting. She reported that she had been experiencing these symptoms for years. She reported that lights, noise, moving her neck, bending down, lifting heavy objects and increasing intracranial pressure aggravated her symptoms. Tylenol and hydrocodone alleviated her symptoms. Ms. Jakubek ordered an additional MRI of Dye's brain to investigate whether there was normal CSF flow around her Chiari malformation. (Tr. 668-670). The MRI showed a

3

10 mm Chiari malformation with no definite CSF flow through the cisterna magna and foramen of magendie. Ms. Jakubek discussed surgical options with Dye on March 29, 2016. (Tr. 665-666).

On February 23, 2016, Dye saw Dr. Mendoza for a painful lump on her right forearm. Dr. Mendoza noted that Dye had a dysphoric mood, precipitated by emotional stress, anhedonia, insomnia, agitation and distractibility. (Tr. 1015-1016). On April 4, 2016, Dye followed-up with Dr. Mendoza for her Arnold Chiari malformation and headaches. Dr. Mendoza noted continued neck and abdominal pain. (Tr. 1009). Dye followed-up with Dr. Mendoza again on June 13, 2016. (Tr. 1543).

On July 11, 2016, Dye reported shooting upper left abdominal pain "ongoing for about 3 days." She estimated a pain severity of 2/10. (Tr. 1694). Dr. Mendoza ordered an abdominal ultrasound, which showed fatty infiltration of the liver, a post previous cholecystectomy, normal common bile duct and "not well visualized" pancreas. (Tr. 2001). Dye followed-up with Dr. Mendoza on August 2, 2016 after an emergency room visit on July 29th. She complained of sensory loss on the left side of her face and droopiness. She also complained of nausea diarrhea, vomiting and stomach pains. Dr. Mendoza noted agitation, confusion, decreased concentration, sleep disturbance, anxiety and nervousness. (Tr. 1691-1693). Dye followed up with Dr. Mendoza for nausea, vomiting and stomach pain again on August 11, 2016.

On September 12, 2016, Dye complained of headache, abdominal cramping and kidney stones. Dr. Mendoza noted that Dye's headaches were chronic and occurred daily. He noted that her abdominal pain occurred every several days and had been "waxing and waning." (Tr. 1961). Dye saw Dr. Mendoza for cold symptoms on October 11, 2016. She continued to report abdominal cramping every several days. (Tr. 1952, 1672).

Dye met with gastroenterologist, Sravanthi Parasa on November 17, 2016. (Tr. 2070). Dr. Parasa ordered some testing and recommended that Dye continue to take Viberzi because she had

4

good symptom control with it. He also recommended that she start a gastroparesis diet involving six small meals a day. (Tr. 2070).

Dye called the emergency room at Fairview Hospital on December 12, 2016. She complained of a severe headache with a knot on the back of her head. (Tr. 1774-1775).

Ms. Jakubek assessed Dye again on December 8, 2016. She recommended continued conservative treatment and that Dye try to lose some weight. She ordered a follow-up in one year with a new cervical MRI with cineflow. (Tr. 1776).

On December 21, 2016, Dye consulted with Dr. Norman Sese for headaches. She reported daily throbbing headaches in the bifrontal location, associated with photophobia and phonophobia. She reported severity of up to 8/10 at times. She said that the headaches would come with a warning; squiggly lines or black dots in her peripheral vision with flashes of light sometimes a few minutes before she would get a migraine. The migraines lasted the whole day. (Tr. 1770).

Dye followed-up with Dr. Mendoza on January 5, 2017. She reported recurrent abdominal pain of 3/10 in severity. Dye saw Dr. Mendoza on February 28, 2017 for neck pain. Dr. Mendoza noted that Dye had a dysphoric mood and somatic symptoms. He opined that the degree of incapacity she was experiencing as a consequence of her mental health problem was moderate. He also noted continued abdominal pain. (Tr. 1921). Dr. Mendoza diagnosed agoraphobia, neck pain, right upper quadrant pain, Arnold Chiari malformation, and other headache syndrome. (Tr. 1925).

Dye followed up with Dr. Sese on February 23, 2017. (Tr. 2014). She had been doing well on Topamax but was still having headaches on and off. Dr. Sese adjusted Dye's medications and scheduled a follow-up appointment in six weeks. (Tr. 2014). Also on February 23, 2017, Dye had an "extensive" conversation with Ms. Jakubek regarding her fears of surgery. She was fearful

5

due to agoraphobia and was going to discuss this with her psychiatrist to develop a plan of care to manage her anxiety after surgery. (Tr. 2029).

On March 8, 2017, Dye complained of dizziness and a numbing/tingling sensation all over. She had been vomiting during the past three days. She was having severe headaches. She did not have any abdominal pain, fever or photophobia. (Tr. 1916).

Dye followed up for anxiety with Dr. Mendoza on April 11, 2017.  He noted dysphoric mood and somatic symptoms including fatigue. (Tr. 1910). On June 8, 2017, Dye saw Dr. Mendoza for right ear pain. He also noted that she was having neck and abdominal pain. (Tr. 1908).

Dye saw Dr. Parasa on June 7, 2017. He noted that Dye's symptoms were well controlled on the gastroparetic diet. (Tr. 2078). On June 23, 27, 2017, Dr. Sarel Vorster noted that Dye was able to cope with her intermittent headaches. (Tr. 2037).

On August 3, 2017, Dye saw Dr. Mendoza for diarrhea lasting three weeks. (Tr. 1902). On September 13, 2017, Dye saw Dr. Mendoza due to a threatened miscarriage. She was also having neck pain, and rated the pain severity as 6/10. Dr. Mendoza noted that Dye's neck pain was a chronic problem. (Tr. 1892).

    **B.**    **Relevant Opinion Evidence**

        **1.**    **Treating Physician – Dr. Jose Mendoza**

Dr. Mendoza completed a Physical Residual Functional Capacity Questionnaire on February 19, 2018. (Tr. 2105-2110). Dr. Mendoza indicated that he had a "life time" contact with Dye. He listed her diagnosis as Arnold Chiari malformation and opined that her prognosis was poor. He stated that her symptoms included headaches, neck, back and muscle pain. He described her pain as severe and sharp from her head down to her back. He noted that an MRI had objectively supported his clinical findings. (Tr. 2105). Dr. Mendoza stated that he was treating

6

Dye with narcotics and long pain management; this treatment decreased her pain but caused drowsiness. He stated that Dye was not a malingerer. He noted that depression, anxiety and a "fear of side effects" affected Dye's physical condition. (Tr. 2106). Dr. Mendoza opined that Dye was incapable of even "low stress" jobs because she was unable to follow simple instructions with episodes of pain and stress. He opined that she could walk 50 feet and that she could sit for 10 minutes and stand for 5 minutes at a time. He opined that she could sit, stand and/or walk for less than 2 total hours in an 8 hour workday; she would also need to include periods of walking around for one minute breaks. (Tr. 2107). Dr. Mendoza opined that Dye would need a job permitting shifting positions and that she would need to take unscheduled breaks every 10 minutes for five minutes of rest. She would not, however, need to elevate her legs. (Tr. 2108). He opined that Dye could not lift and carry any amount of weight; that she had significant limitations in repetitive reaching, handling or fingering; and that her impairments were likely to produce good days and bad days. Finally, he opined that she would be absent more than four times a month due to her impairments or treatment. (Tr. 2109).

### 2. State Agency Consultants

On August 4, 2016, state agency reviewing consultant, Sandra Banks, Ph.D. reviewed Dye's mental health records and adopted the PRT/MRFC from the prior ALJ's decision. (Tr. 240). Dr. Banks opined that Dye had moderate limitations in activities of daily living, maintaining social functioning and maintaining concentration, persistence or pace. Dr. Banks found no repeated episodes of decompensation. (Tr. 237). On January 19, 2017, state agency reviewing consultant, Cynthia Waggoner, Psy.D, reviewed Dye's mental health records and also adopted the RFC from the prior ALJ's decision. Dr. Waggoner noted moderate limitations in Dye's abilities to: 1) understand, remember or apply information; 2) interact with others; 3) concentrate, persist or maintain pace; and 4) adapt or manage oneself. (Tr. 253).

On August 22, 2016, Steve McKee, M.D. reviewed Dye's medical records and adopted the RFC from the prior ALJ's decision. (Tr. 239). On January 20, 2017, state agency reviewing consultant, Teresita Cruz, M.D., also adopted the RFC from the 2013 ALJ's decision. (Tr. 255).

### C. Relevant Testimonial Evidence

Dye testified at the ALJ hearing. (Tr. 38-62). She was 34 years old at the time of the hearing. (Tr. 38). She was living with her mother, but had driven herself to the hearing. She had completed high school. (Tr. 39). Dye was 5'7" and weighed 310 pounds. (Tr. 62).

Dye's mother cooked and washed the dishes. Dye was able to do her own laundry and she was able to climb stairs. (Tr. 40). She was able to go shopping but did not go very often. (Tr. 41). She did not have many hobbies and could not read well, but she enjoyed watching TV. (Tr. 41-42).

An average day for Dye involved waking up between 9:00 and 11:00 a.m. She got dressed and showered every day. (Tr. 43). She would then watch TV but did little else. (Tr. 43). She used her phone and loved taking naps. Due to her agoraphobia, she did not leave the house every day. (Tr. 44, 56-57). She was occasionally able to attend church with her mother. (Tr. 59-60). Despite her physical and mental limitations, Dye had previously had a boyfriend. (Tr. 60-61).

Dye had not worked since 2006. (Tr. 45). She testified that her headaches had gotten worse since her 2013 hearing. (Tr. 46). Dye testified that she had headaches 24/7. They ranged from very mild to severe. At times, she took extra medication and stayed in a dark room for a couple of hours until the pain subsided. (Tr. 58-59).

Dye also testified that IBS made it difficult to work. (Tr. 46). She had general stomach problems that were connected to her mental impairments. (Tr. 57). Dye also had problems with her back, her knees, carpal tunnel and cubital tunnel syndrome. (Tr. 47). Dye had been diagnosed with bipolar disorder. (Tr. 48). She testified that her mood swings made it difficult for her to

8

work. (Tr. 49). She also had a difficult time remembering. (Tr. 50-51, 55). She had pre-asthma and pre-apnea; she used an inhaler two to four times a week. (Tr. 53). Dye was taking a number of medications for her conditions. Because her pain medication caused nausea, she also took medication for nausea. (Tr. 49).

Dye testified that she had been instructed to avoid lifting anything heavier than a gallon of milk due to her Chiari malformation. (Tr. 52). She estimated that she could stand for about 10 minutes before her legs and back would start hurting. She could sit a little longer than standing (approximately a half hour) and could walk for about five minutes. (Tr. 53). She could reach for things, and she could hold things. However, her hands would start cramping up after about 90 seconds causing her to drop objects. She could not kneel or crawl due to knee pain. (Tr. 54). Dye stated that she could not tolerate crowds. (Tr. 54-55).

Vocational Expert ("VE") Robert Mosley also testified at the hearing. (Tr. 62-66). The VE testified that an individual who had no past work experience and could lift and carry 5 pounds frequently and 10 pounds occasionally; could stand and walk for two hours in an eight-hour day; could sit for six hours in an eight-hour day; could occasionally climb stairs and ramps; could never climb ladders, ropes or scaffolding; could frequently balance; occasionally stoop, kneel, crouch, and crawl; could reach in all directions; could frequently handle, finger and feel; could not be exposed to loud noise or concentrated vibration; could perform simple, routine tasks with simple, short instructions; could make simple decisions; could have few workplace changes; could not interact with the public, but could have superficial interaction with coworkers and supervisors; could ask and answer simple questions; could give and follow simple directions; could not work in cooperation with others or at a fast pace with production quotas; could not read instructions, write reports or perform math calculations; and, if there was any reading, it must be very simple, one-syllable words, would be able to work as a touch-up screener of circuit boards, a final assembler,

9

and a lens inserter. (Tr. 63-64). There were significant numbers of these jobs in the national economy. (Tr. 64).

If the individual was limited to occasional handling, fingering and feeling, she would not be able to perform any jobs. (Tr. 64-65). If the individual were off task 15% of the workday, she would not be able to perform any jobs. (Tr. 65). Finally, if the individual missed four or more days of work per month, she would not be able to maintain any employment. (Tr. 66).

## IV. The ALJ Decision

The ALJ made the following paraphrased findings relevant to this appeal:

4. Dye had the residual functional capacity to perform sedentary work, except she was able to carry five pounds frequently and ten pounds occasionally; she could stand for two hours in an eight-hour day and sit for six hours in an eight-hour day; she could occasionally climb stairs or ramps, but no ladders ropes or scaffolds; she could frequently balance and occasionally stoop, kneel, crouch and crawl; she could reach in all directions and frequently handle, finger and feel. She could have no exposure to loud noises or concentrated vibration. She could perform simple, routine tasks with simple, short instructions, make simple decisions and have few workplace changes; could have no interaction with the public, but superficial interaction with coworkers and supervisors; could not work in tandem with others or at a fast pace with production quotas; and could not be required to read instructions, write reports or perform math calculations. (Tr. 19-20).

9. Considering her age, education, work experience, and residual functional capacity, there were jobs existing in significant numbers in the national economy that Dye could perform. (Tr. 26).

Based on all of her findings, the ALJ determined that Dye had not been under a disability since May 27, 2016, the application date. (Tr. 27).

## V. Law & Analysis

### A. Standard of Review

The court reviews the Commissioner's final decision to determine whether it was supported by substantial evidence and whether proper legal standards were applied. 42 U.S.C. §§ 405(g), 1383(c)(3); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007).

"Substantial evidence" is not a high threshold for sufficiency. *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). "It means – and means only – 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). Even if a preponderance of the evidence supports the claimant's position, the Commissioner's decision still cannot be overturned "'so long as substantial evidence also supports the conclusion reached by the ALJ.'" *O'Brien v. Comm'r of Soc. Sec.*, No. 19-2441, 2020 U.S. App. LEXIS 25007, at *15, ___ F. App'x ___ (6th Cir. Aug 7, 2020) (quoting *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003)). Under this standard, the court cannot decide the facts anew, evaluate credibility, or re-weigh the evidence. *Jones*, 336 F.3d at 476. And "it is not necessary that this court agree with the Commissioner's finding," so long as it meets this low standard for evidentiary support. *Rogers*, 486 F.3d at 241; *see also Biestek*, 880 F.3d at 783 ("It is not our role to try the case de novo." (quotation omitted)). This is so because the Commissioner enjoys a "zone of choice" within which to decide cases without being second-guessed by a court. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

Even if substantial evidence supported the ALJ's decision, the court will not uphold that decision when the Commissioner failed to apply proper legal standards, unless the legal error was harmless. *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("[A] decision . . . will not be upheld [when] the SSA fails to follow its own regulations and [when] that error prejudices a claimant on the merits or deprives the claimant of a substantial right."); *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 654 (6th Cir. 2009) ("Generally, . . . we review decisions of administrative agencies for harmless error."). Furthermore, the court will not uphold a decision, when the Commissioner's reasoning does "not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Charter*, 78 F.3d 305, 307 (7th Cir. 1996)); *accord Shrader v. Astrue*, No. 11-13000,

11

2012 U.S. Dist. LEXIS 157595 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, No. 1:10-CV-734, 2011 U.S. Dist. LEXIS 141342 (S.D. Ohio Nov. 15, 2011); *Gilliams v. Astrue*, No. 2:10 CV 017, 2010 U.S. Dist. LEXIS 72346 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-CV-19822010, 2010 U.S. Dist. LEXIS 75321 (N.D. Ohio July 9, 2010). Requiring an accurate and logical bridge ensures that a claimant, as well as a reviewing court, will understand the ALJ's reasoning.

The Social Security regulations outline a five-step process the ALJ must use to determine whether a claimant is entitled to benefits: (1) whether the claimant is engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or combination of impairments; (3) if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. Part 404, Subpart P, Appendix 1; (4) if not, whether the claimant can perform her past relevant work in light of his RFC; and (5) if not, whether, based on the claimant's age, education, and work experience, she can perform other work found in the national economy. 20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 416.920(a)(4)(i)-(v); *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642-43 (6th Cir. 2006). Although it is the Commissioner's obligation to produce evidence at Step Five, the claimant bears the ultimate burden to produce sufficient evidence to prove that she is disabled and, thus, entitled to benefits. 20 C.F.R. §§ 404.1512(a), 416.912(a).

### B. Treating Physician Rule[4]

Dye argues that, by failing to state good reasons for assigning little weight, the ALJ failed to properly evaluate the opinion of her treating physician, Dr. Mendoza. ECF Doc. 11 at 13-15. At Step Four, the Commissioner must weigh every medical opinion that the Social Security

---

[4] 20 C.F.R. §§ 416.927 applies to Dye's claim because it was filed before March 27, 2017.

12

Administration receives. 20 C.F.R. §§ 416.927(c). An ALJ must give a treating physician's opinion controlling weight, unless she articulates good reasons for discrediting that opinion. *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013). Good reasons for giving a treating source's opinion less-than-controlling weight include: (1) a lack of support by medically acceptable clinical and laboratory diagnostic techniques; (2) inconsistency with or contradictory findings in the treating source's own records; and (3) inconsistency with other substantial evidence in the case record. *See Biestek*, 880 F.3d at 786 ("An ALJ is *required* to give controlling weight to a treating physician's opinion, so long as that opinion is supported by clinical and laboratory diagnostic evidence [and] not inconsistent with other substantial evidence in the record." (citing 20 C.F.R. § 416.927(c)(2)); *Gayheart*, 710 F.3d 365, 376; *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1179 (11th Cir. 2011) (stating that good reasons include that: "(1) [the] treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) [the] treating physician's opinion was conclusory or inconsistent with the doctor's own medical records."). But inconsistency with nontreating or nonexamining physicians' opinions alone is not a good reason for rejecting a treating physician's opinion. *See Gayheart*, 710 F.3d at 377 (stating that the treating physician rule would have no practical force if nontreating or nonexamining physicians' opinions were sufficient to reject a treating physician's opinion).

If an ALJ does not give a treating physician's opinion controlling weight, the ALJ must weigh the opinion based on: the length and frequency of treatment, the supportability of the opinion, the consistency of the opinion with the record as a whole, whether the treating physician is a specialist, the physician's understanding of the disability program and its evidentiary requirements, the physician's familiarity with other information in the record, and other factors that might be brought to the ALJ's attention. *See Gayheart*, 710 F.3d at 376; 20 C.F.R. § 416.927(c)(2)-(6). Nothing in the regulations requires the ALJ to explain how she considered

13

each of the factors. *See* 20 C.F.R. § 416.927(c); *Biestek*, 880 F.3d at 786 ("The ALJ need not perform an exhaustive, step-by-step analysis of each factor."). However, the ALJ must at least provide good reasons for the ultimate weight assigned to the opinion. *Cole v. Astrue*, 661 F.3d 931, 938 (6th Cir. 2011) (acknowledging that, to safeguard a claimant's procedural rights and permit meaningful review, 20 C.F.R. §§ 416.927 (c) requires the ALJ to articulate good reasons for the ultimate weight given to a medical opinion). When the ALJ fails to adequately explain the weight given to a treating physician's opinion, or otherwise fails to provide good reasons for the weight given to a treating physician's opinion, remand is appropriate. *Cole*, 661 F.3d at 939; *see also Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 407 (6th Cir. 2009) (holding that the failure to identify good reasons affecting the weight given to an opinion "'denotes a lack of substantial evidence, even whe[n] the conclusion of the ALJ may be justified based upon the record.'" (citing *Rogers*, 486 F.3d at 243)).

After summarizing Dr. Mendoza's opinions, the ALJ assigned little weight to them, explaining:

> The undersigned assigns this opinion little weight, as it is not consistent with Dr. Mendoza's own treatment records. In particular, on two occasions, progress notes indicated the claimant had reduced range of motion and spasm of the cervical back (B20F/15, 28). However, the remaining treatment records, through November 2017, documents the claimant often demonstrated normal range of motion, no edema, no cranial nerve deficits, no abdominal distention, and a normal mood and affect. (B20F/9, 15, 20, 25, 28, 34, 39, 44, 50, 55, 60, 65.)

The ALJ assigned little weight to Dr. Mendoza's opinion because she found that it was inconsistent with his own records. In support, the ALJ cited the physical examination findings documented in Dr. Mendoza's treatment notes. The ALJ credited two of these records because they showed reduced range of motion and neck spasm. However, she found that the rest of the physical examination findings (cited above) did not support Dr. Mendoza's opinions regarding Dye's functional limitations.

14

Dye argues that there is little connection between Dr. Mendoza's physical exam findings and her Chiari malformation, the condition that caused her limitations. Dye contends that the main symptoms caused by her Chiari malformation were headaches, dizziness and pain. ECF Doc. 14 at 3. Thus, Dye argues, it was irrelevant that Dr. Mendoza's physical examinations noted "normal range of motion, no edema, no cranial nerve deficits, no abdominal distention, and a normal mood and affect." I agree. Dr. Mendoza's opinion clearly stated that the diagnosis causing Dye's physical limitations was her Chiari Malformation. (Tr. 2105). He also stated that Dye's symptoms included "headache, neck, back pain and muscle pain." He did *not* indicate that her symptoms were "reduced range of motion, abdominal distention or mood and affect." Thus, when the ALJ cited these normal findings, she found no inconsistency between Dr. Mendoza's opinions and his treatment notes.

Moreover, because she assigned less than controlling weight to Dr. Mendoza's opinions, the ALJ was required to explain the weight she *did* assign and provide good reasons for that weight. 20 C.F.R. §§ 416.927(c). Under the agency's regulations, good reasons could include factors such as the length and frequency of treatment, the supportability of the opinion, the consistency of the opinion with the record as a whole, whether the treating physician is a specialist, the physician's understanding of the disability program and its evidentiary requirements, the physician's familiarity with other information in the record, and other factors that might be brought to the ALJ's attention. *See Gayheart*, 710 F.3d at 376; 20 C.F.R. §§ 416.927(c)(2)-(6). The ALJ never mentioned any of these factors when she assigned little weight to Dr. Mendoza's opinions. She rejected his opinions on the sole basis that they were not supported by Dr. Mendoza's own treatment notes. However, she cited treatment notes that appear to be irrelevant to Dye's Chiari malformation. In short, her evaluation of Dr. Mendoza's opinions did not comply with the agency's treating physician rule. 20 C.F.R. §§ 416.927(c)(2)-(6).

15

The Commissioner argues that it was appropriate for the ALJ to look at Dr. Mendoza's examination findings to determine whether they supported the severe restrictions stated in his opinions. ECF Doc. 13 at 10. I do not disagree. But Dr. Mendoza stated that the symptoms that Dye was experiencing due to her Chiari malformation were "headaches, neck, back pain, muscle pain." (Tr. 2105). The Commissioner has listed common symptoms generally associated with Chiari malformation.[5] Then, the Commissioner has compared this list of general symptoms of Chiari malformation to the ALJ's reasoning, arguing that it was proper for her to compare Dr. Mendoza's treatment notes to a general list of symptoms. However, this comparison of possible symptoms caused by Chiari malformation was never part of the ALJ's discussion and did not justify the ALJ's assignment of little weight to Dr. Mendoza's opinions, which were directly related to Dye's *specific* symptoms.

The Commissioner cites Dr. Sertich's notes as support for the ALJ's decision to assign little weight to Dr. Mendoza's opinions. ECF Doc. 13 at 10-11. However, the ALJ did not cite these records in support of the weight she assigned to Dr. Mendoza's opinion.[6] Thus, these are merely after-the-fact reasons proposed by the Commissioner to justify the ALJ's assignment of little weight to the treating source's opinion. But, the Commissioner's post-hoc rationalizations do not cure the ALJ's failure to provide good reasons for assigning little weight to Dr. Mendoza's opinions. *Steckroth v. Comm'r of Soc. Sec.,* 2012 U.S. Dist. LEXIS 44895, (E.D. Mich. March 30, 2012), quoting *Hyatt Corp v. NLRB*, 939 F.2d 361, 367 (6th Cir. 1991) ("Courts are not at liberty to speculate on the basis of an administrative agency's order. . . . [nor is the court] free to accept

---

[5] In classic post-hoc reasoning, the Commissioner has relied upon medical information gleaned from a web site published by the National Institute of Neurological Disorders and Stroke, information neither referred to nor relied upon by the ALJ in her dismissal of Dr. Mendoza's opinions. ECF Doc. 13 at 10.

[6] The ALJ did discuss Dr. Sertich's treatment notes (Tr. 22) but not in comparison to Dr. Mendoza's opinions. Some of Dr. Sertich's recommendations, such as recommending that Dye undergo decompression surgery, seemingly support the opinions of Dr. Mendoza.

'appellate counsel's rationalization for agency action in lieu of reasons and findings enunciated by the Board.'") (citations omitted).

The Commissioner has acknowledged the ALJ's lack of good reasons by citing case law holding that the ALJ's good reasons may be implicit. ECF Doc. 13 at 12., citing *Brock v. Comm'r of Soc. Sec.,* 368 F. App'x 622, 625 (6th Cir. 2010) and *Nelson v. Comm'r of Soc. Sec.,* 195 F. App'x 462, 472 (6th Cir. 2006). In *Brock,* the ALJ's reasoning was not necessarily "implicit" it was just better than the reasoning provided here. In *Brock,* the ALJ noted that the treating physician's opinion was based on diagnoses that had no diagnostic radiological studies and that the treating physician had not recommended any further investigative measures. *Brock,* 368 F. App'x at 624. Here, an MRI confirmed Dye's Chiari malformation and the record shows several referrals by Dr. Mendoza to further investigate treatment options for the condition.

In *Nelson,* the Sixth Circuit found that the ALJ had indirectly attacked the treating physicians' opinions as inconsistent with the rest of the record. *Nelson,* 195 F. App'x at 471. But here, the ALJ's discussion of the medical evidence did *not* indirectly contradict Dr. Mendoza's opinions. In fact, the medical record contained objective diagnostic testing confirming the condition causing Dye's symptoms. As recognized by the Commissioner, the ALJ considered repeat MRIs evidencing the Chiari malformation and recommendations that she consider surgical options as treatment. (Tr. 22); ECF Doc. 13 at 10-11. Thus, the medical records included objective, diagnostic tests confirming the diagnosis discussed in Dr. Mendoza's opinion. This case can be distinguished from *Nelson* on that basis. Dye correctly argues that the Commissioner's cited cases are distinguishable from the facts of this case.

The Commissioner also argues that the ALJ properly assigned greater weight to the opinions of the state reviewing psychological consultants. ECF Doc. 13 at 11. The undersigned notes that the ALJ did not reject Dr. Mendoza's opinion based on the opinions of the state agency

17

psychological consultants. If she had[7], this argument might be more relevant because inconsistency with nontreating physicians' opinions alone is not a good reason for rejecting a treating physician's opinion. *See Gayheart*, 710 F.3d at 377. Here, this was not a reason stated by the ALJ to reject Dr. Mendoza's opinion. She rejected the treating physician's opinion because she found it inconsistent with his own treatment notes.

The ALJ failed to comply with the treating physician rule in discounting Dr. Mendoza's opinion. And there is no way to know if she considered the factors required to be applied to Dr. Mendoza's opinion because she never mentioned any of them. *See Gayheart*, 710 F.3d at 376; 416.927(c)(2)-(6). As stated above, the Commissioner's post hoc rationalizations are insufficient to demonstrate that the ALJ's error was harmless. The Sixth Circuit has stated that the ALJ's failure to identify good reasons for discounting the weight given to an opinion "'denotes a lack of substantial evidence, even whe[n] the conclusion of the ALJ may be justified based upon the record.'" *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 407 (6th Cir. 2009) (citing *Rogers*, 486 F.3d at 243)). Such is the case here. Because the ALJ failed to follow the proper legal standards in discounting Dr. Mendoza's opinion, I recommend that the ALJ's decision be remanded for further consideration.

    **C.**    **Residual Functional Capacity**

Dye also argues that the ALJ's RFC determination was not supported by substantial evidence because her decision failed to discuss how Dye's headaches and agoraphobia would affect her ability to sustain regular work. At Step Four of the sequential analysis, the ALJ must determine a claimant's RFC by considering all relevant medical and other evidence. 20 C.F.R. §§

---

[7] Even if the ALJ had based her assignment of little weight to Dr. Mendoza's opinion on the opinions of the nontreating physicians' opinions, many of the Dr. Mendoza's physical functional limitations (See Tr. 2107) were not contradicted by the *psychological* opinions rendered by Dr. Banks and Waggoner. (Tr. 240, 256). Moreover, these opinions adopted the prior ALJ's RFC and ALJ Hixson found that the new diagnosis of Chiari malformation constituted new and material evidence supporting additional impairments. (Tr. 16). Thus, reliance on these opinions to reject Dr. Mendoza's opinions would have been misplaced.

416.920(e). The RFC is an assessment of a claimant's ability to do work despite her impairments. *Walton v. Astrue*, 773 F. Supp. 2d 742, 747 (N.D. Ohio 2011) (citing 20 C.F.R. § 404.1545(a)(1) and SSR 96-8p, 1996 SSR LEXIS 5 (July 2, 1996)). "In assessing RFC, the [ALJ] must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'" SSR 96-8p, 1996 SSR LEXIS 5. Relevant evidence includes a claimant's medical history, medical signs, laboratory findings, and statements about how the symptoms affect the claimant. 20 C.F.R. §§ 416.929(a); *see also* SSR 96-8p, 1996 SSR LEXIS 5.

Dye complains that the ALJ did not adequately consider her headaches and agoraphobia in assessing Dye's RFC. The ALJ expressly considered Dye's headaches in association with her discussion of Dye's Chiari malformation. (Tr. 22). She also noted that Dye had been diagnosed with agoraphobia. (Tr. 24). The ALJ found that the limitations caused by these conditions were much less severe than alleged by Dye.

The RFC is a determination for the ALJ, but it must be based on *all* the relevant evidence. 20 C.F.R. §§ 416.920(e); *Rudd v. Comm'r of Soc. Sec.,* 531 F. App'x 719, 728 (6th Cir. 2013). Here, the ALJ did not properly evaluate Dr. Mendoza's opinion. Dr. Mendoza opined that the limitations caused by Dye's Chiari malformation symptoms were much greater than those assessed by the ALJ. The ALJ was not required to adopt Dr. Mendoza's opinion in its entirety. *See Shepard v. Comm'r of Soc. Sec.,* 705 F. App'x 435, 442-43 (6th Cir. 2017) (rejecting the argument that "the ALJ's RFC lacks substantial evidence because no physician opined that [the claimant] was capable of light work"). However, she *was* required to provide good reasons for assigning less than controlling weight to those opinions. If, upon remand, the ALJ determines that Dr. Mendoza's opinion is entitled to controlling weight, the RFC determination will need to be revised (likely to the point Dye would be found disabled). Thus, although it does not appear that the ALJ completely disregarded Dye's headaches and agoraphobia when she made her RFC

19

finding, any error in the RFC will be corrected after Dr. Mendoza's opinion has been reevaluated. Because Dye's RFC argument is closely intertwined with her treating physician argument, I recommend that the ALJ be required to reassess Dye's RFC after properly evaluating the opinion of Dr. Mendoza.

## VI. Recommendation

Because the ALJ failed to follow the proper legal standards in evaluating Dr. Mendoza's opinions, I recommend that the ALJ's decision be VACATED and the case be REMANDED for further consideration.

Dated: September 25, 2020

Thomas M. Parker
United States Magistrate Judge

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document. Failure to file objections within the specified time may waive the right to appeal the District Court's order. See *U.S. v. Walters*, 638 F.2d 947 (6th Cir. 1981). See also *Thomas v. Arn,* 474 U.S. 140 (1985), reh'g denied, 474 U.S. 1111 (1986).